UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK<br><br>*Plaintiff*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; FEDERAL EMERGENCY MANAGEMENT AGENCY,<br><br>*Defendants*. | No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. On September 11, 2001, New York was the target of an unprecedented terrorist attack. That day forced an overhaul of emergency preparedness in the United States. As part of that overhaul and in response to the 9/11 Commission's report, Congress created the Rail and Transit Security Grant Program ("TSGP"). Since its inception, the TSGP has awarded New York funds to, among other things, protect sensitive transit networks against chemical, biological, radiological, or explosive threats, improve transit evacuation systems, and make improvements to transit security. 6 U.S.C. § 1135(b).

2. Across presidential administrations of both parties, the U.S. Department of Homeland Security ("DHS") and its sub-agency, the Federal Emergency Management Agency ("FEMA"), have operated TSGP to maximize support for states based on terrorist threats. Indeed, they are *required by statute to do so*. Congress mandated that eligibility for TSGP be determined

1

"based solely on risk." 6 U.S.C. § 1135(c). New York, which faces some of the most dramatic risks of terrorism, has always received a yearly award consistent with this statutory criterion.

3. In this case, Plaintiff the State of New York seeks to stop Defendants from cutting this funding for the purpose of punishing New York State for its policy decision not to devote its limited sovereign law enforcement resources to supplement the federal government's civil immigration enforcement (the "Reallocation Decision").

4. New York learned about the Reallocation Decision not from the government but from an online news story, which reported earlier today that "[t]he federal government will deny the [the Metropolitan Transit Authority ("MTA")] tens of millions of dollars in requested security grant funding, withholding every dollar the agency asked for because New York City and New York state are 'sanctuary jurisdictions.'" Dave Cole & David Myer, BIG ZERO: Trump Stiffs MTA in 'Sanctuary City' Tantrum, STREETSBLOG NEW YORK CITY (Sept. 30, 2025), https://nyc.streetsblog.org/2025/09/30/trump-admin-zeros-out-mta-security-grant-funding. At this time, MTA has not even received formal notice that their award was cut to nothing.

5. Upon information and belief, New York's award was changed from the $33,898,500 that FEMA had targeted New York to receive in the Notice of Funding Opportunity ("NOFO") to $0. As of the filing of this complaint, New York has received no explanation from DHS or FEMA, despite repeated attempts to contact the agency through the Department of Justice. But upon information and belief, New York has been targeted because the administration believes it is a "sanctuary" jurisdiction. FEMA also did not treat all "sanctuary" jurisdictions evenhandedly. Upon information and belief, at the same time as it eliminated New York's allocation, FEMA made increases to other States' allocations, including other "sanctuary" jurisdictions.

6. On January 20, 2025, his first day in office, President Trump expressly directed DHS to "ensure that so-called 'sanctuary' jurisdictions do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). The President has deemed that certain States and jurisdictions are in "lawless insurrection," Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025), because he disagrees with how they allocate their own local law enforcement resources. As recently as September 24, DHS proclaimed that "[c]ities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding," and that "[n]o lawsuit . . . is going to stop us from doing that."[1]

7. DHS was referring to the injunction entered against it just five days ago in *Illinois v. Fed. Emergency Mgmt. Agency*, — F. Supp. 3d — , No. 25-CV-00206-WES-PAS, 2025 WL 2716277 (D.R.I. Sept. 24, 2025) [hereinafter "*Illinois v. FEMA*"]. In that case, DHS and FEMA had sought to upend the Nation's emergency management system, holding critical emergency preparedness and response funding hostage unless States agreed to devote their scarce law-enforcement resources to assisting the federal government in enforcing federal immigration law. DHS did so by adding terms to its "Standard Terms and Conditions"—applicable to all grant awards—that required States to divert their law enforcement resources away from core public safety missions to federal civil immigration enforcement as a condition of receiving any federal funds. New York is one of the plaintiff states in that suit. *See Illinois v. FEMA*, 2025 WL 2716277. Just last week, the U.S. District Court for the District of Rhode Island agreed, issuing an opinion granting the States' motion for summary judgment and permanently enjoining DHS and FEMA from enforcing the conditions on the grants that they administer.

---

[1] Anna Griffin, Federal Judge Rejects Administration Efforts to Tie State Disaster Funds to Immigration Cooperation, N.Y. Times (Sept. 24, 2025), https://www.nytimes.com/2025/09/24/us/politics/trump-disaster-aid-immigration.html.

3

8. But DHS and FEMA were undeterred. Just yesterday, New York and 12 other States, all among the plaintiffs in *Illinois v. FEMA*, filed suit with respect to yet more grants that DHS and FEMA are using to punish the States. *See Illinois v. Noem*, No. 25-CV-00495 (D.R.I.) [hereinafter "*Illinois v. Noem*"]. The Judge in that case awarded a TRO around 3:30 PM ET today.

9. Now today, FEMA issued increased TSGP award notifications for other states, and Plaintiffs have discovered the Reallocation Decision through the media. At 1:07 PM today, counsel in *Illinois v. FEMA* and *Illinois v. Noem* sent an email communication to the Department of Justice inquiring about the story, asking for New York's notice of award, and alerting the government that they would file the instant lawsuit and a TRO motion before the end of the federal fiscal year tonight.  Counsel followed up that email with a second.  At the time of filing, New York has not received a response.  The New York Attorney General's Office was sent (not by Defendants) a power-point presentation that appears to be a genuine document prepared and presented to Congressional staff, which is aligned with the online story. That document, attached as Exhibit 3 to the Affirmation of Rabia Muqaddam, identifies the MTA as the *only* applicant for TSGP funding that was denied, while other applicants received greater than originally allocated awards. It further states that MTA did not receive their award "because it is based in a Sanctuary Jurisdiction city." *Id.* at *25.

10. The Reallocation Decision is unlawful in multiple respects, and it should be vacated and set aside. First, it violates the Administrative Procedure Act ("APA") for numerous reasons, including that it is unreasoned and contrary to the TSGP statute, which requires that eligibility for TSGP be "based solely on risk" of terrorist attacks. 6 U.S.C. § 1135(c).  Second, the action is *ultra vires*. And finally, it violates the Constitution.

11.　　New York seeks declaratory and injunctive relief setting aside the Reallocation Decision and requiring DHS and FEMA to adhere to their statutory responsibilities in awarding TSGP funds.

12.　　In the interim, however, New York seeks a temporary restraining order (a) requiring DHS and FEMA to de-obligate the TSGP funds reallocated from New York to other jurisdictions, including by rescinding fiscal year 2025 award notifications if necessary, (b) enjoining DHS and FEMA from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means the TSGP funds reallocated from New York to other jurisdictions; and (c) suspending the September 30, 2025, statutory lapse of TSGP funds to the full extent necessary to permit obligation of revised TSGP awards that will return New York's allocation specified in the 2025 NOFO, including, if necessary, by recording as an obligation of the United States the full $33,898,500 target allocation to New York identified in the 2025 NOFO pursuant to 31 U.S.C. § 1501(a)(6).

## JURISDICTION AND VENUE

13.　　The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

14.　　Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in her official capacity. Plaintiff the State of New York is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within this district.

## PARTIES

A. **Plaintiff**

15.     Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

B. **Defendants**

16.     Defendant Kristi Noem (the "DHS Secretary") is the United States Secretary of Homeland Security and the federal official in charge of DHS. The DHS Secretary is sued in her official capacity.

17.     Defendant DHS is an agency and executive department of the United States government and has responsibility for implementing the federal grant programs at issue in this action, including through FEMA and other subagencies.

18.     Defendant David Richardson is the Senior Official Performing the Duties of the Administrator of FEMA (the "Interim FEMA Head"). The Interim FEMA Head is sued in his official capacity.

19.     Defendant Federal Emergency Management Agency ("FEMA") is a federal agency within DHS that coordinates operational and logistical disaster response and oversees the administration of many of the federal grant programs at issue in this action. FEMA is a distinct entity within DHS. *See* 6 U.S.C. §§ 313(a); 316(a). By law, the DHS Secretary "may not substantially or significantly reduce . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006." *Id*. § 316(c)(1); *see also id.* § 591h(c).

## ALLEGATIONS

A. **Since 2007, Congress Has Awarded TSGP Funds Based on Risk as Required by Statute**

20. At issue in this case is FEMA's Rail and Transit Security Grant Program ("TSGP"). Created as part of Congress's response to the 9/11 Commission's report, TSGP requires grantees to use the funds to, among other things, protect sensitive transit networks against chemical, biological, radiological, or explosive threats; improve transit evacuation systems; and make improvements to transit security. 6 U.S.C. § 1135(b).

21. Consistent with the structure created by Congress in the aftermath of 9/11, New York relies on TSGP as a critical tool to support its efforts to protect its transit infrastructure from terrorist threats. The MTA has designed its budget around the expectation that TSGP funds would continue to be allocated to New York because the statutory criteria for eligibility must be based "solely" on the risk of terrorist attacks. 6 U.S.C. § 1135(c).

22. MTA has applied for, and received, TSGP funds since the program's creation in 2007. Over the lifetime of the program, MTA has received approximately $842.3 million.

23. TSGP funds go to critical security programs in New York, and support structural hardening, electronic physical security, cybersecurity, and weapons of mass detection technologies. New York also relies on TSGP funding for activities such as targeted counterterrorism patrols.

B. **New York has Exercised Its Sovereign Prerogative to Choose How to Deploy Limited Law Enforcement Resources Within its Borders**

24. New York is responsible for maintaining the day-to-day safety of all residents of its communities. New York has enacted statutes and established policies to effectively enforce state and local laws, keep public order, and provide public safety services. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police

7

power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

25. One critical choice that New York can make in doing so is whether to devote its scarce law enforcement and other agency resources to assisting the federal government in enforcing federal civil immigration law.

26. New York has chosen to limit its entanglement in the enforcement of federal immigration law. *See, e.g.*, N.Y. Exec. Orders 170 and 170.1. New York has determined that public safety and law enforcement benefit from a relationship of trust between immigrant communities and the state. Its policies uniformly authorize state authorities to comply with all applicable federal laws, but impose limitations on the circumstances under which state officers can devote their own resources to assisting the federal government in enforcing federal civil immigration law.

27. These policies are based on the considered experience of law enforcement and other agencies, which demonstrates that persons who lack lawful immigration status or have family members or friends who lack lawful immigration status are less likely to report a crime as victims or witnesses or seek services if they fear that the officials will turn them over to civil immigration authorities. This reluctance makes it increasingly difficult for officers to solve crimes and bring suspects to justice, putting all residents at risk.

28. New York's determination is also well-supported by analyses of empirical data. Numerous studies have confirmed that immigration-related fears prevent witnesses, victims, and others from reporting crimes. Surveys of law enforcement officers and analyses of victim reporting data conclude that fear of immigration enforcement decreased immigrant victims' likelihood of making police reports and reporting domestic violence, participating in investigations, and working with prosecutors. *See* Rafaela Rodrigues et al., *Promoting Access to Justice for Immigrant*

*and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* at 72-73, National Immigrant Women's Advocacy Project (May 3, 2018).[2] One study estimated that policies designed to foster greater trust between immigrant communities and police could cause an additional 90,000 violent incidents per year to be reported to law enforcement nationwide. *See* Ricardo D. Martínez-Schuldt & Daniel E. Martínez, *Immigrant Sanctuary Policies and Crime-Reporting Behavior: A Multilevel Analysis of Reports of Crime Victimization to Law Enforcement, 1980 to 2004*, 86 AM. SOCIOLOGICAL REV. 154, 170 (2021).

29. New York has likewise determined that it will interfere with important public welfare functions if state employees divert non-law enforcement resources to engage in unnecessary inquiries into individuals' immigration status, fulfill information requests by federal immigration officials not required by law, or facilitate civil immigration arrests in state buildings. *E.g.*, New York Exec. Order 170 (Sept. 15, 2017); New York Exec. Order 170.1 (Apr. 25, 2018).

30. Thus, New York's decisions in this area are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz*, 521 U.S. at 928—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

C. **Defendants Announce Their Opposition to New York's and Other States' Policies**

31. The document sent to the New York Attorney General's Office, which appears to be a genuine PowerPoint presentation provided by FEMA on September 29, 2025, supports that MTA was targeted because it is "in a sanctuary city jurisdiction."

---

[2] http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf.

9

32. This is only the latest in a string of attacks, however. Since January 2025, Defendants have engaged in a concerted campaign to pressure States, including New York, to serve as enforcers of federal immigration law, subverting the design of DHS grant programs.

33. On January 20, 2025, his first day in office, President Trump issued an executive order directing the Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions do not receive access to Federal funds," and to take "any other lawful actions, criminal or civil" that the Secretary of Homeland Security deem warranted. Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025).

34. On April 28, 2025, President Trump issued another Executive Order relating to jurisdictions with policies designed to improve relations between law enforcement and communities. *See* Exec. Order No. 14287, 90 Fed. Reg. 18761 (April 28, 2025). The EO requires "the Attorney General, in coordination with [DHS]" to publish a "list" of "sanctuary jurisdictions" and to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id.* § 2(a). The Attorney General and DHS were to publish this list within 30 days, meaning May 28, 2025. *Id.*

35. Section 3(a) of the April 28 Executive Order then directs agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate," *id.* § 3(a), 90 Fed. Reg. at 18761-62, expanding to all federal agencies a similar directive in the January 20 Executive Order that applied only to the Attorney General and DHS, 90 Fed. Reg. 8443 at 8446, § 17.

36. On May 29, 2025, DHS published a list of so-called "sanctuary jurisdictions," which included New York. The list was taken down two days later after 9:19 PM on Saturday and revised. New York and New York City remain on the list. DOJ Office of Public Affairs, *Justice*

*Department Publishes List of Sanctuary Jurisdictions* (Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuary-jurisdictions.

**D.     Defendants Try but Fail to Condition All DHS Federal Funds on Their Views About New York's Policies**

37.     *Illinois v. FEMA* successfully countered DHS's first attempt to act on its animus toward certain States by depriving them of federal funds unrelated to civil immigration enforcement. In March and April 2025, DHS posted on its website revised versions of the DHS Standard Terms and Conditions (the "Terms and Conditions").[3] These Terms and Conditions govern "all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2025."[4] The revised versions included "provisions requiring state and local recipients to certify that they will assist in enforcing federal immigration law." *Illinois v. FEMA*, 2025 WL 2716277, at *2.

38.     The States of Illinois, California, New Jersey, Rhode Island, Colorado, Connecticut, Delaware, Hawai'i, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont, Washington, and Wisconsin, and the District of Columbia brought suit, claiming that the civil immigration conditions imposed on all DHS funds were unlawful. *See* Complaint, *Illinois v. FEMA*, ECF 1 (D.R.I. May 13, 2025).[5]

39.     The parties cross-moved for summary judgment, and, last week, the district court issued an opinion granting the *FEMA* Plaintiff States' motion for summary judgment and holding that the promulgation of the immigration conditions violated the APA and the Constitution. *Illinois v. FEMA*, 2025 WL 2716277, at * 16..

---

[3] Available at https://www.dhs.gov/publication/dhs-standard-terms-and-conditions.
[4] *Id.*
[5] The District of Columbia was joined with the first amended complaint on July 2, 2025.

40. The court explained that the decision to promulgate the conditions was arbitrary and capricious because DHS had failed to "examine[] the relevant data or articulate[] a fact-based reason" for doing so, instead relying principally on the President's executive order "calling upon agencies to terminate funding to 'sanctuary jurisdiction[s].'" *Id.* at *12 (internal quotation marks omitted). DHS, the court explained, had provided no "actual explanation of why it is necessary to attach sweeping immigration conditions to all the grants at issue here, regardless of their statutory purpose or programmatic objectives." *Id.* Moreover, the Court concluded that DHS "engaged in a wholly under-reasoned and arbitrary process," "did not meaningfully evaluate the States' reliance interests," and compounded these failures by using "vague and confusing language" that "ma[de] vague compliance a nearly impossible-to-achieve moving target." *Id.*

41. Accordingly, by judgment entered September 24, 2025, the district court vacated the immigration conditions as to all DHS awards and all recipients. *Id.* at *15. The court also issued a permanent injunction because "Plaintiff States stand to suffer irreparable harm; the effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable." *Id.* at *16. The court therefore "permanently enjoin[ed] Defendants from enforcing the contested conditions against Plaintiff States." *Id.*

42. When asked about the court's opinion, DHS's spokesperson said: "Cities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding."[6] She added: "No lawsuit, not this one or any other, is going to stop us from doing that."[7]

---

[6] Griffin, *supra* note 1.
[7] *Id.*

43.     DHS's spokesperson's explicit threat bore fruit just a few days later when DHS slashed over $233 million in Homeland Security Grant Program funding to many States protected by the *Illinois v. FEMA* injunction, redistributing their funding to other States. DHS redistributed the funds that it cut from these jurisdictions to jurisdictions that it views as aligned with its policy preferences. A group of the jurisdictions that are plaintiffs in *Illinois v. FEMA* brought suit again. Around 3:30 PM ET, the judge in that case awarded Plaintiffs a TRO substantially similar to the one New York seeks here. The written order was issued at around 7:41 PM ET. See Exhibit 5 to Muqaddam Aff. (*Illinois v. Noem*, ECF 14 (D.R.I September 30, 2025)).

E.     **Defendants Preliminarily Allocate TSGP Funds In The August NOFO, But Then Reallocate Them Away From New York**

44.     On or about August 1, 2025, DHS posted the Notice of Funding Opportunity ("NOFO") for the FY2025 TSGP. Ex. 1. The NOFO stated that awards were anticipated to be made no later than September 30, 2025. *Id.* at 4. For federal fiscal year 2025, Congress appropriated $94,500,000 for the TSGP and other transit-related programs, of which $83,700,000 was slated by DHS specifically for the TSGP. Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 607 (Mar. 23, 2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9, at § 1101 (Mar. 15, 2025); Ex. 1 at 4.

45.     The $94.5 million that Congress appropriated expires on October 1, 2025, the first day of the federal government's fiscal year 2026. *See* Pub. L. 119-4 at § 1101; *see also* 31 U.S.C. § 1502(a).

46.     Office of Management and Budget administrative requirements, which DHS has adopted as its own binding regulation, require DHS to disclose "the expected dollar values of individual awards." 2 C.F.R. §§ 200.204(a)(6). Consistent with that requirement, the TSGP NOFO included "target allocations" for New York's MTA totaling $33,898,500. Ex. 1 at Appx. A.

47. New York timely applied for TSGP funding on August 14, 2025.

48. On September 30, 2025, New York learned through media accounts that its FY2025 award for the TSGP was $0. At the time of the filing of this complaint, New York had received *no* communications from DHS or FEMA as to why New York's award was zeroed out, but upon information and belief it was because DHS believes New York is a "sanctuary" jurisdiction. The power-point presentation that Counsel at the New York Attorney General's office received further supports this allegation.

49. The zeroing out of New York's TSGP award will severely impact the State's security programs, including those aimed at protecting New York citizens from weapons of mass destruction and terrorist threats and attacks. Without TSGP funding, New York will be forced to significantly reduce its police presence (including training and equipment) and its counterterrorism security footprint.

## FIRST CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action

50. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

51. Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made") (internal quotation mark omitted); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy"

when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).

52. When changing positions, an agency must consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (brackets and internal quotation marks omitted). The agency must not "entirely fail[] to consider an important aspect of the problem" or "rel[y] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

53. Defendants failed to comply with these bedrock requirements in making the Reallocation Decision in multiple respects.

54. First, Defendants provided no explanation whatsoever for why it reallocated funding away from New York's MTA. Agencies may not hide the reasons for their decisions. *See Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

55. Second, Defendants relied on an extra-statutory factor when making the Reallocation Decision—whether New York is a so-called "sanctuary" jurisdiction. Congress has circumscribed what FEMA can use as eligibility criteria—whatever factors they consider, determination of eligibility must be "based solely on risk." 6 U.S.C. § 1135(c). In line with this, FEMA identified New York's MTA as an eligible agency and allocated $33,898,500 to it based on risk. *See* Ex. 1. Yet, DHS ordered the reallocation of TSGP funds based on whether the recipient has policies DHS dislikes. An agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *City of Providence v. Barr*, 954 F.3d 23, 39 (1st Cir. 2020); *see also, e.g., State Highway Comm'n of Mo. v. Volpe*, 479

F.2d 1099, 1114 (8th Cir. 1973) (agency cannot set spending requirements "remote and unrelated" to the underlying statute).

56. Third, Defendants abandoned the risk allocation set out in the NOFO without explanation. DHS's own regulations require the NOFO to disclose "the expected dollar values of individual awards" up front. 2 C.F.R. §§ 200.204(a)(6). Despite this requirement, the MTA's award was zeroed out entirely. In making such a drastic policy change, an agency must "articulate a satisfactory explanation for its action." *Fox*, 556 U.S. at 513. Defendants have provided no such explanation.

57. Fourth, Defendants entirely failed to consider the legitimate reliance New York had on the NOFO's expected dollar value of the award. Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. Here, MTA has structured its budget in reliance on the money they expect to receive from DHS-administered grants, including TSGP. To reallocate those funding levels, without notice of explanation, disrupts the operation of crucial emergency preparedness programs in New York, which is the one of the greatest targets for foreign terrorist threats and has already experienced the great foreign terrorist attack in American history.

58. The Reallocation Decision will cause harm to New York.

## SECOND CAUSE OF ACTION

### *Ultra Vires* Agency Action Not Authorized by Congress

59. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

60. An executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986)

61. Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

62. At no point did Congress direct DHS to make cooperation with civil immigration enforcement a criterion for receiving these critical transportation security funds.

63. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

64. Defendants lack the statutory authority to make the Reallocation Decision. The TSGP statute mandates that eligibility must be "based solely on risk," 6 U.S.C. § 1135(c). That inquiry cannot extend to whether New York has disfavored policies concerning cooperation with federal immigration officials.

65. In making the Reallocation Decision, Defendants exceeded the statutory authority granted to DHS by Congress. The Reallocation Decision is therefore an ultra vires executive agency action.

66. The Reallocation Decision will cause harm to New York.

### THIRD CAUSE OF ACTION

### Violation of Administrative Procedure Act
### Agency Action in Excess of Statutory Authority and Contrary to Law

67. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

68. The APA requires that a court set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

69. The APA also requires that a court set aside final agency action that is "not in accordance with the law." 5 U.S.C. § 706(2)(A).

70. Defendants lack the statutory authority to make the Reallocation Decision. The TSGP statute mandates that eligibility must be "based solely on risk." 6 U.S.C. § 1135(c).

71. In making the Reallocation Decision, Defendants exceeded the statutory authority granted to DHS and FEMA by Congress. For the same reason, Defendants acted contrary to the statute that governs eligibility for TSGP.

72. The Reallocation Decision therefore must be set aside under the APA.

73. The Reallocation Decision will cause harm to New York.

**FOURTH CAUSE OF ACTION**

**Violation of the U.S. Constitution**
**Equal Sovereignty Principle**

74. Plaintiff reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

75. States retain sovereignty under the Constitution and there is also a "fundamental principle of *equal* sovereignty" among the States. *Shelby Cnty.*, *Ala. v. Holder*, 570 U.S. 529, 544 (2013) (quotation marks omitted). Pursuant to this principle, if the federal government is to divide the States, it "must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions." *Id*. at 553.

76. Here, Defendants have treated New York differently. Upon information and belief, while New York's MTA had their award zeroed-out entirely, other states' awards increased. Defendants have identified no basis for this, nor could they provide any such basis that accords

with the statutory text or purpose of the TSGP. Instead, upon information and belief Defendants are seeking retribution against New York because the Administration disapproves of New York's policies. Such disparate treatment without any basis violates the principle of equal sovereignty.

77. The Reallocation Decision will cause harm to New York.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that the Court:

a. Declare that the Reallocation Decision is unlawful because it: (a) violates the APA; (b) is *ultra vires;* and (c) is contrary to the Constitution of the United States;

b. Set aside the Reallocation Decision;

c. Direct Defendants to obligate New York's full 2025 TSGP targeted allocation consistent with the statutory criteria;

d. Require defendants to rescind the fiscal year 2025 award notifications to the extent required to restore New York's full 2025 targeted allocation;

e. Enjoin DHS and FEMA from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means New York's targeted allocation specified in the 2025 TSGP NOFO;

f. Suspend the September 30, 2025, statutory lapse of TSGP funds to the full extent necessary to permit obligation of a revised TSGP award to New York at the level of the target allocation specified in the fiscal year 2025 NOFO, including by recording as an obligation of the United States the full appropriation for the TSGP for fiscal year 2025 pursuant to 31 U.S.C. § 1501(a)(6);

g. Retain jurisdiction to monitor defendants' compliance with this Court's judgment;

h. Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

    i. Award such additional relief as this Court may deem just and proper.

Submitted September 30, 2025,

**LETITIA JAMES**
  ATTORNEY-GENERAL OF NEW YORK

/s/ Rabia Muqaddam
Rabia Muqaddam
  *Chief Counsel for Federal Initiatives*
Stephen C. Thompson
  *Special Counsel*
Julie Dona
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-8883
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*