UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK,<br><br>   *Plaintiff*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DAVID RICHARDSON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; FEDERAL EMERGENCY MANAGEMENT AGENCY,<br><br>   *Defendants*. | No. _____ |

**PLAINTIFF'S EMERGENCY
MOTION FOR A TEMPORARY RESTRAINING ORDER**

**RELIEF SOUGHT BY SEPTEMBER 30, 2025 11:59 P.M.**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ........................................................................................................................... 3

    A.    Congress's Longstanding Support for MTA's Counter-Terrorism Preparedness ............................................................................................................ 3

    B.    The Department's Enjoined Attempt to Conscript States in Immigration Enforcement .................................................................................................................. 4

    C.    *Illinois v. Noem* Filed Yesterday ................................................................................ 6

ARGUMENT ................................................................................................................................. 6

I.    Plaintiffs Are Likely to Succeed on the Merits ................................................................... 7

    A.    The Reallocation Decision Is Arbitrary and Capricious ......................................... 7

        1.    There is no explanation whatsoever from Defendants ................................... 8

        2.    Defendants appear to have relied on factors which Congress has not intended it to consider in making allocation decisions ................................... 8

        3.    Defendants have abandoned their position in the TSGP notice of funding opportunity without acknowledgement or explanation .................... 10

        4.    Defendants failed to consider New York's reliance interests in TSGP funding .......................................................................................................... 11

II.    The Equities Compel Emergency Relief ......................................................................... 12

    A.    Emergency Relief Is Needed to Avert Irreparable Harm, and the Court has the Authority to Preserve the Status Quo ............................................................. 12

    B.    The Balance of Equities and Public Interest Favor Emergency Relief ................. 13

CONCLUSION ............................................................................................................................ 14

# TABLE OF AUTHORITIES

Page(s)

## Cases

*City of Houston v. Dep't of Hous. & Urb. Dev.*,
  24 F.3d 1421 (D.C. Cir. 1994) ............................................................................. 3, 12

*City of Providence v, Barr*,
  954 F.3d 23 (1st Cir. 2020) ......................................................................................... 9

*Cnty. of Suffolk v. Sebelius*,
  605 F.3d 135 (2d Cir. 2010) ..................................................................................... 12

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  67 F.4th 1027 (9th Cir. 2023) ..................................................................................... 8

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  192 F. Supp. 3d 54 (D.D.C. 2016) ............................................................................. 8

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ........................................................................................... 7-8, 10-11

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .................................................................................................. 10

*Francisco Sanchez v. Esso Standard Oil Co.*,
  572 F.3d 1 (1st Cir. 2009) ......................................................................................... 13

*Illinois v. Fed. Emergency Mgmt. Agency*,
  --- F. Supp. 3d ---, No. 25-CV-00206-WES-PAS, 2025 WL 2716277 (D.R.I. Sept. 24, 2025) ................................................................................................ 1, 4-6, 11

*In re Impounded Food Stamp Program Appropriations*,
  54 Comp. Gen. 962 (1975) ....................................................................................... 13

*Int'l Org. of Masters, Mates & Pilots v. NLRB*,
  61 F.4th 169 (D.C. Cir. 2023) ................................................................................... 11

*Kakar v. United States Citizenship & Immigr. Servs.*,
  29 F.4th 129 (2d Cir. 2022) ...................................................................................... 10

*Kane v. De Blasio*,
  19 F.4th 152 (2d Cir. 2021) ........................................................................................ 3

*Martin v. Warren*,
  482 F. Supp. 3d 51 (W.D.N.Y. 2020) ......................................................................... 6

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .............................................................................................. 7-9

*Nat'l All. to End Homelessness v. Turner*,
    No. 25-CV-00447, 2025 WL 2638377 (D.R.I. Sept. 14, 2025) (McElroy, J.) ........................13

*Or. Nat. Res. Council v. Thomas*,
    92 F.3d 792 (9th Cir. 1996) ...................................................................................8

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) .................................................................................................9

*Population Inst. v. McPherson*,
    797 F.2d 1062 (D.C. Cir. 1986) ...........................................................................12

*Robbins v. Reagan*,
    780 F.2d 37 (D.C. Cir. 1985) ...............................................................................10

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ...............................................................................13

*State Highway Comm'n of Mo. v. Volpe*,
    479 F.2d 1099 (8th Cir. 1973) ...............................................................................9

*Waterkeeper All., Inc. v. U.S. E.P.A.*,
    399 F.3d 486 (2d Cir. 2005) .................................................................................9

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .............................................................................................7, 13

## Federal Statutes

5 U.S.C. § 706(2) ............................................................................................................7

6 U.S.C.
    § 1135 ..................................................................................................................3, 4, 9
    § 1635 ........................................................................................................................11

31 U.S.C.
    § 1301(c)(2) ..............................................................................................................12
    § 1501 ........................................................................................................................13
    § 1501(a)(6) ....................................................................................................3, 14-15
    § 1501(a)(9) ..............................................................................................................13
    § 1502(a) ..............................................................................................................3, 12
    § 1502(b) ..............................................................................................................3, 13

## Federal Regulations

2 C.F.R. § 200.204(a)(6) ................................................................................................................10

## Rules

Fed. R. Civ. P. 65(b)(1) ..................................................................................................................7

## Miscellaneous Authorities

Anna Griffin, *Federal Judge Rejects Administration Efforts to Tie State Disaster Funds to Immigration Cooperation*, N.Y. Times (Sept. 24, 2025) ............................................6

Dave Cole & David Myer, BIG ZERO: Trump Stiffs MTA in 'Sanctuary City' Tantrum, Streetsblog New York City (Sept. 30, 2025), https://nyc.streetsblog.org/2025/09/30/trump-admin-zeros-out-mta-security-grant-funding ..............................................................................................................................2

Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025) ........................................4

Exec. Order No. 14218, § 2(a)(ii), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025) .............................4

Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025) ......................................5

## INTRODUCTION

Plaintiff the State of New York seeks an immediate TRO to protect its ability to receive around $33 million in anti-terrorism funds prior to the expiration of the relevant appropriation at 11:59 PM tonight.

Six days ago, a federal district court held that the Department of Homeland Security ("DHS") could not lawfully condition the award of federal funds on "requiring state and local recipients to certify that they will assist in enforcing federal immigration law." *Illinois v. Fed. Emergency Mgmt. Agency*, --- F. Supp. 3d ---, No. 25-CV-00206-WES-PAS, 2025 WL 2716277, at *2, *16 (D.R.I. Sept. 24, 2025) (internal quotation mark omitted) [hereinafter "*Illinois v. FEMA*"]. New York is a plaintiff in that suit. The court held that DHS's decision to impose such immigration conditions was "both arbitrary and capricious and unconstitutional." *Id.* at *16. A number of Plaintiff States in that litigation, including New York, then had to sue again *one day ago* over FEMA's decision to reallocate millions of dollars in emergency preparedness grants. *Illinois v. Noem*, No. 25-CV-00495 (D.R.I. Sept. 29, 2025) [hereinafter "*Illinois v. Noem*"]. New York's funding under those programs was cut by approximately 79%. Around 3:30 PM today, the Judge in that case granted a TRO.

This very day, DHS has, *for a third time*, attempted to seek retribution against New York over its policy not to supplement federal officials in enforcing federal civil immigration law. This time, DHS has zeroed-out entirely the approximately $33 million dollars DHS preliminarily allocated to New York's Metropolitan Transit Authority (the "MTA") in its 2025 Notice of Funding Opportunity for the Transit Security Grant Program (TSGP) (the "2025 NOFO"). *See* Exhibit 1 to the Affirmation of Rabia Muqaddam ("Muqaddam Aff.") (Dep't. of Homeland Security, *Notice of Funding Opportunity Fiscal Year 2025 Transit Security Grant Program*) at 36. The TSGP appropriation expires tonight at 11:59 PM. While New York's award has been entirely cut, other

1

states have received marked increases in funding. To Plaintiff's knowledge, many applicants received significantly larger awards than their originally allocated amounts. Thus, New York's award has been whittled in favor of other jurisdictions (the "Reallocation Decision").

New York learned about the Reallocation Decision not from the government but from an online news story, which reported earlier today that "[t]he federal government will deny the MTA tens of millions of dollars in requested security grant funding, withholding every dollar the agency asked for because New York City and New York state are 'sanctuary jurisdictions.'" Exhibit 2 to Muqaddam Aff. (Dave Cole & David Myer, BIG ZERO: Trump Stiffs MTA in 'Sanctuary City' Tantrum, Streetsblog New York City (Sept. 30, 2025), https://nyc.streetsblog.org/2025/09/30/trump-admin-zeros-out-mta-security-grant-funding). At 1:07 PM today, counsel in *Illinois v. FEMA* and *Illinois v. Noem* sent an email communication to the Department of Justice inquiring about the story, asking for New York's notice of award, and alerting the government that they would file the instant lawsuit and TRO before the end of the federal fiscal year tonight. Counsel followed up with a second email and has received no response at the time of filing this case.

The New York Attorney General's Office then received a power-point presentation (not from defendants) that appears to be a genuine document prepared and presented to Congressional staff by FEMA, which is in line with the online news article. Exhibit 3 to Muqaddam Aff. That document identifies the MTA as the *only* applicant for TSGP funding that was denied, while other applicants received greater than originally allocated awards. *See id.* 26. It further states that MTA did not receive their award "because it is based in a Sanctuary Jurisdiction city." *Id.* at 25.

The Reallocation Decision is unlawful for a number of reasons—one of which is the focus of this emergency TRO Motion. The Reallocation Decision is arbitrary and capricious in violation

of the Administrative Procedure Act (APA). MTA has received no explanation whatsoever from Defendants about the denial of their award, much less an explanation that is reasoned, that is based on statutory factors, or that takes into account the agency's change in position, negative impacts, and New York's reliance interests.

Today is the last day of the federal fiscal year. At 12:00 AM, the appropriation for the 2025 TSGP will expire, and DHS will be unable to incur new obligations based on it. *See* 31 U.S.C. § 1502(a). In the unique posture of this case, where DHS appears to have chosen to obligate the balance of the TSGP funds at the very end of the fiscal year, there is a significant risk that, absent immediate relief freezing the status quo, the funds at issue will be irretrievably disbursed to other States after the original appropriation has expired. *See City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1427 (D.C. Cir. 1994). This Court has the authority to direct DHS to record the contested funds as an obligation of the United States and otherwise simply preserve matters as they stand while litigation unfolds. *See* 31 U.S.C. §§ 1501(a)(6), 1502(b). Plaintiff States do not now seek *disbursement* of any funds but merely sufficient relief to "preserve the status quo" pending the trial-court proceedings. *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021).

The Court should issue temporary relief to ensure that New York has the opportunity to challenge this profound affront to the rule of law

## BACKGROUND

**A.  Congress's Longstanding Support for MTA's Counter-Terrorism Preparedness**

TSGP is authorized by Section 1406 of the *Implementing Recommendations of the 9/11 Commission Act of 2007* (Pub. L. No. 110-53), codified at 6 U.S.C. § 1135, and the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101-2. Since the

program's inception, New York has received TSGP funds to help ensure that New York City's transportation infrastructure is not vulnerable to future terrorist attacks.

Critically, the TSGP statute narrowly circumscribes the factors that DHS can consider when awarding TSGP funds—eligibility must be "based solely on risk." 6 U.S.C. § 1135(c). Applying this criterion, New York should be awarded substantial funds as it faces some of the most profound risks when it comes to terrorist threats.

Over the lifetime of the program, MTA has received approximately $842.3 million. Exhibit 4 to Muqaddam Aff. (Declaration of Jaibala Patel dated September 30, 2025 ("Patel Decl.")) ¶ 16. TSGP funds go to critical security programs in New York, and support structural hardening, electronic physical security, cybersecurity, and weapons of mass detection technologies. New York also relies on TSGP funding for activities such as targeted counterterrorism patrols. *Id.*

### B. The Department's Enjoined Attempt to Conscript States in Immigration Enforcement

On January 20, 2025, his first day in office, President Trump expressly directed DHS to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). Another order on February 19, 2025, directed not only DHS but all executive departments to "ensure, consistent with applicable law, that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies." Exec. Order No. 14218, § 2(a)(ii), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025).

Then, "[o]n March 27, DHS revised the standard terms and conditions governing all federal grants it oversees, adding provisions requiring state and local recipients to certify that they will assist in enforcing federal immigration law." *Illinois v. FEMA*, 2025 WL 2716277, at *2. A group of jurisdictions, including New York, brought suit, claiming that the immigration conditions

imposed on all DHS funds were unlawful. *See* Complaint, *Illinois v. FEMA*, ECF 1 (D.R.I. May 13, 2025).

Even as that litigation unfolded, defendants continued to make clear that they would press forward with punishing disfavored jurisdictions whenever and however they could. On April 28, 2025, the President issued yet another executive order denouncing "State and local officials" who "use their authority to violate, obstruct, and defy the enforcement of Federal immigration laws," calling States' sovereign choice about how to employ their own law enforcement "a lawless insurrection." Exec. Order No. 14287, § 1, 90 Fed. Reg. 18761, 18761 (Apr. 28, 2025). This executive order also directed DHS to "publish a list of" so-called "sanctuary jurisdictions" by May 28, 2025. *Id.* § 2(a).

The parties cross-moved for summary judgment, and the court ruled for the plaintiffs, finding that DHS's attempt to impose the immigration conditions was both arbitrary and capricious and unconstitutional. To begin, "DHS made no attempt to claim that it examined the relevant data or articulated a fact-based reason for its actions." *Illinois v. FEMA*, 2025 WL 2716277, at *12. The Court concluded that DHS "engaged in a wholly under-reasoned and arbitrary process," "did not meaningfully evaluate the States' reliance interests," and compounded these failures by using "vague and confusing language" that "ma[de] vague compliance a nearly impossible-to-achieve moving target." *Id.* To the extent DHS had any reasons at all, "the string of memoranda on which the Defendants rely were drafted in direct response to the Executive Order calling upon the agencies to terminate funding to 'sanctuary jurisdiction[s].'" *Id.* (alteration in original). "With these conditions, states are left to guess at what conduct satisfies the requirements under threat of losing billions in essential funding." *Id.*

Accordingly, by judgment entered September 24, 2025, the district court vacated the immigration conditions as to all DHS awards and all recipients. *Id.* at *15. The court also issued a permanent injunction because "Plaintiff States stand to suffer irreparable harm; the effect of the loss of emergency and disaster funds cannot be recovered later, and the downstream effect on disaster response and public safety are real and not compensable." *Id.* at *16.

### C. *Illinois v. Noem* Filed Yesterday

When asked about the court's opinion in *Illinois v. FEMA*, DHS's spokesperson said: "Cities and states who break the law and prevent us from arresting criminal illegal aliens should not receive federal funding." Anna Griffin, *Federal Judge Rejects Administration Efforts to Tie State Disaster Funds to Immigration Cooperation*, N.Y. Times (Sept. 24, 2025), https://www.nytimes.com/2025/09/24/us/politics/trump-disaster-aid-immigration.html. She added: "No lawsuit, not this one or any other, is going to stop us from doing that." *Id.*

Three days later, DHS slashed over $233 million in Homeland Security Grant Program funding to many States protected by the *Illinois v. FEMA* injunction, redistributing their funding to other States. DHS redistributed the funds that it cut from these jurisdictions to jurisdictions that it views as aligned with its policy preferences. Around 3:30 PM ET, the Judge in this case awarded Plaintiffs a TRO substantially similar to the one New York seeks here. The written order was issued at around 7:41 PM ET. *See* Exhibit 5 to Muqaddam Aff. (*Illinois v. Noem*, ECF 14 (D.R.I September 30, 2025)).

## ARGUMENT

The standard for a temporary restraining order is the same as the standard for a preliminary injunction. *Martin v. Warren*, 482 F. Supp. 3d 51, 68 (W.D.N.Y. 2020). The motion should be granted where the moving party establishes that: (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the

movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65(b)(1). When the government is a party, the last two factors merge. All four factors overwhelmingly support granting a temporary restraining order to freeze matters in place before the end of the 2025 federal fiscal year.

I.     **Plaintiffs Are Likely to Succeed on the Merits**

Plaintiffs are highly likely to succeed in establishing that the Reallocation Decision is unlawful because it is arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2).

    A.     **The Reallocation Decision Is Arbitrary and Capricious**

Defendants have violated the APA by cutting critical anti-terrorism funding to New York for the sole purpose of punishing a jurisdiction that does not use its scarce law enforcement resources to supplement federal officers enforcing federal civil immigration law. This is arbitrary and capricious in a number of ways. An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [] offered an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When changing positions, in particular, an agency must also consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (brackets and internal quotation marks omitted).

Here, the agency has (1) provided no explanation at all, (2) relied on extra-statutory considerations; (3) relied on factors not set forth in the notice of funding opportunity, without explaining its change in position; and (4) ignored the States' profound reliance interests in critical

7

anti-terrorism federal funding first appropriated in response to the report of the 9/11 Commission, with the attendant impacts on public safety; and

> **1. There is no explanation whatsoever from Defendants**

First, there is no explanation whatsoever from the agency to explain the Reallocation Decision. *Id.* at 20 ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'") (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). Indeed, New York has not even received *any* formal notice from the federal government about the loss of funding. An agency's invoked reasons must not be secret, internal reasons but rather "reasons that can be scrutinized by courts and the interested public." *New York*, 588 U.S. at 785. This lack of explanation alone requires judgment on the APA claim in Plaintiff States' favor.

To the extent the agency has a rationale, it has been reported to be brazen retribution against New York for its state policies. The power-point presentation received by the New York Attorney General's Office further supports this. *See* Ex. 5.

> **2. Defendants appear to have relied on factors which Congress has not intended it to consider in making allocation decisions**

First, whether the agency "entirely failed to consider an important aspect of the problem" or "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, necessarily "turns on what a relevant substantive statute makes important," *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) (internal quotation marks omitted); *see Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1039 (9th Cir. 2023). Put differently, the universe of information an agency must (and must not) consider depends on "the scope of the duty imposed on the agency by Congress in the relevant substantive statute." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016), *aff'd*, 883 F.3d 895

(D.C. Cir. 2018). It is thus arbitrary and capricious for the agency to "rel[y] on factors which Congress has not intended it to consider" in making its decision, *State Farm*, 463 U.S. at 43; *see Waterkeeper All., Inc. v. U.S. E.P.A.*, 399 F.3d 486, 498 (2d Cir. 2005).

These principles are even more pressing in the grant context. "*Congress* may fix the terms on which it shall disburse federal money to the States," meaning that any "federally imposed conditions" on States must square with the relevant "legislation enacted pursuant to the spending power." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added). The statutory authorization for a grant program, by definition, sets forth the factors that Congress requires—and permits—an agency to consider in issuing funds. An agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *City of Providence v, Barr*, 954 F.3d 23, 39 (1st Cir. 2020); *see also, e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973) (agency cannot set spending requirements "remote and unrelated" to the underlying statute).

But DHS appears to have relied on a factor that "Congress ha[d] not intended it to consider," *State Farm*, 463 U.S. at 43—namely, whether New York chooses to use its law enforcement resources to aid the federal government in enforcing immigration law. *See* Exhibit 5. As discussed, *supra* pp. 11–12, Congress mandated that eligibility for TSGP be determined "based solely on risk" in allocating TSGP funds, 6 U.S.C. § 1135(c), which DHS has correctly understood to be "risks associated with potential terrorist attacks," Exhibit 1 to Muqaddam Aff. (2025 NOFO) at 10. DHS thus plainly based its decision not on the factor Congress instructed it to consider. Doing so was arbitrary and capricious.

### 3. Defendants have abandoned their position in the TSGP notice of funding opportunity without acknowledgement or explanation

The TSGP notice of funding opportunity announced DHS's view, at the time, on what the appropriate risk allocation was and what factors could be considered in deriving target allocations. Ex. 1 at Appx. A. The notice of funding opportunity is no mere formality: Office of Management and Budget administrative requirements, which DHS has adopted as its own binding regulations, require DHS to disclose "the expected dollar values of individual awards" up front. 2 C.F.R. §§ 200.204(a)(6). The 2025 NOFO allocated approximately $33 million to the MTA.

Yet, suddenly, DHS appears to have identified a new factor that indicated a dramatically different result—whether New York is a sanctuary jurisdiction. When changing policy, "the agency must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Changes in agency policy, just as much as factfinding or any other regulatory pronouncement, require that the agency "'examine the relevant data and articulate a satisfactory explanation for its action.'" *Id.* at 513 (quoting *State Farm*, 463 U.S. at 43). So when, as here, an agency makes a policy change, it "must consider the 'alternatives' that are 'within the ambit of the existing policy'" and assess "whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33 (alterations omitted) (quoting *State Farm*, 463 U.S. at 51).

DHS did none of this. In the grant context, just as in any other, if an agency has "determined that the grant was the best way to fulfill the purposes of" a program, then "[i]n rescinding that determination, the [agency is] clearly compelled to give adequate reasoning for the dramatic change of course." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985); *see also Kakar v. United States Citizenship & Immigr. Servs.*, 29 F.4th 129, 135 (2d Cir. 2022) ("[The reviewing court] must

be certain that an agency has considered all the important aspects of the issue and articulated a satisfactory explanation for its action.") (quotation marks omitted).

### 4. Defendants failed to consider New York's reliance interests in TSGP funding

The Reallocation Decision is finally arbitrary and capricious because DHS "failed to address whether there was legitimate reliance on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 (internal quotation marks omitted). As the Supreme Court has explained, "[w]hen an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 30, 33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id.* at 30 (quotation marks omitted).

New York relies on the annual receipt of critical funds to protect their residents from terrorist threats—funding that was designed by Congress to aid states *in light of the 9/11 attacks on New York City*. *See* Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. 110-53, Title XIV § 1506 (Aug. 3, 2007) (codifying 6 U.S.C. § 1635).

As the court found based on the uncontested record in *Illinois v. FEMA*, Plaintiff States' "budgets are structured in reliance on billions in DHS-administered grants, and they cannot replace those funds from other sources." 2025 WL 2716277, at *9. In imposing the Civil Immigration Conditions, DHS not only failed to "weigh" these longstanding, substantial reliance interests "against competing policy concerns"; it "ignore[d]" them altogether. *Regents*, 591 U.S. at 30, 33 (internal quotation marks omitted). Because the Conditions were adopted "with no regard for the [States'] reliance interests," and DHS "did not acknowledge—much less justify—its adoption" of the new requirements, they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 179–80 (D.C. Cir. 2023).

## II. The Equities Compel Emergency Relief

### A. Emergency Relief Is Needed to Avert Irreparable Harm, and the Court has the Authority to Preserve the Status Quo

Absent emergency relief from this Court, New York will be severely and irreparably harmed by the Reallocation Decision. Congress funded TSGP using an appropriation that will expire tonight at 11:49, the end 2025 federal fiscal year. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 607, (4) (fiscal year 2024 appropriation); Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, § 1101(a)(6), 139 Stat. 9, 11 (continued fiscal year 2025 appropriation under the same terms); 31 U.S.C. § 1301(c)(2) (default rule that appropriations expire after one year unless otherwise specified). Agency obligations against the appropriation must be made on or before September 30. *See id.* § 1502(a). Moreover, where an agency is actively obligating funds to other potential recipients, some courts have held that "to avoid having its case mooted, a plaintiff must both file its suit before the relevant appropriation lapses *and* seek a preliminary injunction preventing the agency from disbursing those funds." *City of Houston*, 24 F.3d at 1427; *see also Cnty. of Suffolk v. Sebelius*, 605 F.3d 135, 138 (2d Cir. 2010) ("Where, as here, the congressional appropriations relating to the funds sought … have been lawfully distributed—and therefore exhausted—by a federal agency, courts lack authority to grant effectual relief . . . ."); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) ("[I]f the government in the instant case is permitted to *distribute* the $10 million to other organizations, the appeal will become moot.").

There is accordingly risk that, if this fiscal year ends with the only TSGP obligations being those made under the Reallocation Decision, the disputed funds will be irretrievably lost, and there will be no effective relief for a court to grant. The Court can prevent this "harsh result," *Cnty. of Suffolk*, 605 F.3d at 138, by simply freezing the status quo and leaving all options for future

12

obligations open to DHS. *See Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009) ("[T]he purpose of a preliminary injunction is to preserve the status quo *before* the merits have been resolved."). Plaintiff States seek no immediate disbursement of any funds; they seek only relief tailored to ensure that this case will not become moot at midnight tonight.[1]

The Court has the power to grant the requested relief. First, 31 U.S.C. § 1501 permits recording of "an obligation of the United States Government" based on "a liability that may result from pending litigation" or "other legal liability of the Government against an available appropriation or fund." 31 U.S.C. § 1501(a)(6), (a)(9). The Comptroller General has held that district courts may use these provisions to "establish[] a valid obligation against the unexpended balance" of an appropriation. *In re Impounded Food Stamp Program Appropriations*, 54 Comp. Gen. 962, 966 (1975). Second, both statute and equity provide this Court with general authority to prevent the lapse of otherwise-expiring funds that are subject to litigation. *See* 31 U.S.C. § 1502(b); *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 98–99 (D.C. Cir. 2021). Exercising these powers, a court recently ordered "that the statutory lapse of the funds at issue in [a] Funding Opportunity" be "suspended pending further order of the Court." *Nat'l All. to End Homelessness v. Turner*, No. 25-CV-00447, 2025 WL 2638377, at *1 (D.R.I. Sept. 14, 2025) (McElroy, J.). And, the court in Illinois v. Noem has entered a similar order today. *See* Exhibit 5.

B. **The Balance of Equities and Public Interest Favor Emergency Relief**

Last, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Through the Reallocation Decision, DHS is seeking retribution against New York, which has exercised its

---

[1] Plaintiff does not concede that it could not claim a right to undistributed balances after the end of this fiscal year. Nevertheless, in the emergency circumstances at issue, a restraining order is warranted to avoid the potential loss of this Court's jurisdiction.

13

sovereign right to choose how to allocate scarce law enforcement resources. There is no public interest in this extortion.

In any event, as explained above, New York does not seek the relief of disbursing any funds from the federal Treasury; rather, New York seeks only to prevent the mootness of its claim by operation of the obligations to other States combined with the end of the federal fiscal year. New York seeks only a pause. New York is thus entitled to a temporary restraining order (a) requiring DHS and FEMA to de-obligate the TSGP funds reallocated from New York to other jurisdictions, including by rescinding fiscal year 2025 award notifications if necessary, (b) enjoining DHS and FEMA from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means the TSGP funds reallocated from New York to other jurisdictions; and (c) suspending the September 30, 2025, statutory lapse of TSGP funds to the full extent necessary to permit obligation of revised TSGP awards that will return New York's allocation specified in the 2025 TSGP NOFO, including, if necessary, by recording as an obligation of the United States the full $33,898,500 target allocation to New York identified in the 2025 pursuant to 31 U.S.C. § 1501(a)(6).

CONCLUSION

New York respectfully requests that the Court:

1. Grant Plaintiff States' motion for a temporary restraining order;
2. Direct defendants to de-obligate the TSGP funds reallocated from New York to other jurisdictions, including by rescinding fiscal year 2025 award notifications if necessary;

3. Enjoin defendants from disbursing, processing, returning to the U.S. Treasury, or otherwise making unavailable by any means the TSGP funds reallocated from New York to other jurisdictions; and

4. Suspend the September 30, 2025, statutory lapse of TSGP funds to the full extent necessary to permit obligation of revised TSGP awards that will return New York's allocation specified in the 2025 TSGP NOFO, including, if necessary, by recording as an obligation of the United States the full $33,898,500 target allocation to New York identified in the 2025 pursuant to 31 U.S.C. § 1501(a)(6).

September 30, 2025

Respectfully submitted,

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Stephen C. Thompson
*Special Counsel*
Julie Dona
*Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-8883
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*