UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
STATE OF NEW YORK,

                        Plaintiff,


            -against-                                          25-cv-8106 (LAK)


KRISTI NOEM, in her official capacity as Secretary of the
Department of Homeland Security; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; DAVID
RICHARDSON, in his official capacity as Senior Offical
Performing the Duties of the Administrator of the Federal
Emergency Management Agency; FEDERAL
EMERGENCY MANAGEMENT AGENCY,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __10/16/2025__


**MEMORANDUM OPINION**


                    Appearances:

                        Rabia Muqaddam
                        Stephen C. Thompson
                        Julie Dona
                        LETITIA JAMES
                        NEW YORK STATE ATTORNEY GENERAL
                        *Attorneys for Plaintiff*

                        Jeffrey Oestericher
                        Assistant United States Attorney
                        JAY CLAYTON
                        UNITED STATES ATTORNEY
                        *Attorney for Defendants*


LEWIS A. KAPLAN, *District Judge.*

                    On September 11, 2001, blocks away from this courthouse, nearly 3,000 people lost

2

their lives in a devastating terrorist attack that destroyed the World Trade Center. In the decades since, New York City has remained a prime target for terrorist attacks. Among the City's foremost targets are its bridges, tunnels, and subway and commuter rail systems. The subways alone have been the subject of at least eight terrorist plots since September 11 according to the City's police commissioner.[1]

        To guard against such attacks, and in response to a recommendation from the federal 9/11 Commission, Congress established the transit security grant program ("TSGP"), which provides security-related grants to transit agencies throughout the country. By statute, TSGP funds must be awarded "solely based on risk."[2] In accord with that mandate, the Metropolitan Transportation Authority ("MTA") — a New York State public authority — consistently has received the largest grants among all TSGP recipients.[3] Until this year.

        In August 2025, the Federal Emergency Management Agency ("FEMA") published its target and expectation that the MTA would receive $33,898,500 in fiscal year 2025 ("FY 2025")

---

[1]     Stefanos Chen & Winnie Hu, *Hochul Attacks Trump for Withholding $34 Million in Security Funding*, N.Y. Times (Oct. 9, 2025), https://www.nytimes.com/2025/10/09/nyregion/hochul-trump-anti-terrorism-nyc-subway.html; *see also* Dkt 27-1 at 4–5 (detailing recent attempted terrorist attacks in the subway system).

[2]     6 U.S.C. § 1135(c)(2).

[3]     In fiscal year 2024, the MTA received $19,809,838, far larger than the next largest grant (approximately $12.6 million). FEMA, Grant Programs Directorate Information Bulletin No. 517 at 20 (Aug. 23, 2024), https://www.fema.gov/sites/default/files/documents/fema_gpd-fy24-preparedness-grants-ib.pdf. In fiscal year 2023, the MTA received $31,655,159, again far larger than the next largest grant (approximately $21 million). FEMA, Grant Programs Directorate Information Bulletin No. 490a (Aug. 22, 2023), https://www.fema.gov/sites/default/files/documents/fema_ib_2023_award_announcement_thgsp_update_signed_508c.pdf.

TSGP funds — $25 million more than the next largest grant.    But less than two months later, without any explanation or notice to the MTA, FEMA (1) cut the MTA's award to zero, and (2) reallocated the funds that otherwise would have gone to the MTA to other TSGP grantees (the "Reallocation Decision").  It did so, it now says, because New York City is a "sanctuary city" — not in any respect because it is not a terrorist target.

The State of New York here sues to compel the federal government to give the MTA the nearly $34 million grant the federal government already had targeted for the MTA.  That is money that the MTA needs to help protect the people who every day ride the MTA's subways, commuter trains and buses and who use its bridges and tunnels against terrorist attacks.  Having considered all of the evidence, this Court now holds that the withholding of these funds is arbitrary, capricious, and a blatant violation of the law.  It grants a permanent injunction requiring the federal government to grant those funds to the MTA.

## *Facts*

I.    *Transit Security Grant Program*

Following the September 11, 2001, terrorist attacks, the National Commission on Terrorist Attacks Upon the United States, known also as the 9/11 Commission, issued a report containing several recommendations for strengthening national security and preventing terrorist attacks.[4]  "Multiple recommendations in the report addressed the need to improve security and fortify public transportation systems by focusing on risk-based assessments and directing funding

---

[4]    National Commission on Terrorist Attacks Upon the United States, The 9/11 Commission Report ("9/11 Commission Report") (2004), https://govinfo.library.unt.edu/911/report/911Report.pdf.

4

and grant dollars towards higher-risk areas rather than spreading money across the totality of the public transportations [*sic*] system."[5]    Specifically, the report recommended that "[t]he U.S. Government should identify and evaluate the transportation assets that need to be protected, set risk-based priorities for defending them, select the most practical and cost-effective ways of doing so, and then develop a plan, budget, and funding to implement the effort."[6]    The report recommended also that "[h]omeland security assistance should be based *strictly on an assessment of risks and vulnerabilities . . . .*"[7]

In 2007, Congress passed the Implementing 9/11 Recommendations Act.  Among the recommendations adopted from the report was the creation of the TSGP.[8]  The TSGP authorizing statute provides that "[t]he [DHS] Secretary shall establish a program for making grants to eligible public transportation agencies for security improvements . . . ."[9]  Embracing the 9/11 Commission's recommendation, the statute provides also that "the Secretary shall . . . select the recipients of grants based *solely on risk*."[10]

---

[5]    S. Rept. 116-323 (2020), https://www.congress.gov/committee-report/116th-congress/senate-report/323/1.

[6]    9/11 Commission Report at 391.

[7]    *Id.* at 396 (emphasis added).

[8]    Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, Sec. 1406, 121 Stat. 266, 405–08 (2007), codified at 6 U.S.C. § 1135.

[9]    6 U.S.C. § 1135(a)(1).

[10]    *Id.* at § 1135(c)(2) (emphasis added).

## II.    *Target Allocation and Reallocation Decision*

Congress appropriated $83.7 million in FY 2025 TSGP funds.[11]  The lapse date for the appropriation — meaning the deadline for obligating funds from the appropriation to grantees[12] — was September 30, 2025.

On August 1, 2025, DHS issued its 2025 Notice of Funding Opportunity ("NOFO") for the TSGP.  Consistent with DHS regulations,[13] the NOFO included a list of "target allocations" for each of the projected FY 2025 TSGP grantees.[14]  The target allocation for the Metropolitan Transportation Authority ("MTA") was $33,898,500, over four times the next largest target allocation.[15]

FEMA subsequently decided to reduce the MTA's award to $0.  According to the government, "FEMA notified all successful TSGP grant recipients . . . on September 26, 2025, that they had been awarded a TSGP grant and the amount of TSGP funds they had been awarded.  All successful grant recipients were provided with a final Award Letter that contained the amount of the

---

[11]  Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 607, (4) (FY 2024 appropriation); Full Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, § 1101(a)(6), 139 Stat. 9, 11 (FY 2025 appropriation under same terms).

[12]  *See* 31 U.S.C.A. § 1502(a).

[13]  2 C.F.R. § 200.204(a)(6) (notice of funding opportunity must include "the total amount of funding that the Federal agency expects to award, the anticipated number of awards, and the expected dollar values of individual awards").

[14]  Dkt 3-1 at 36–37.

[15]  *Id.*

6

award as well as the final terms and conditions of the grant. "[16]  The final awards redistributed the

$33,898,500 that otherwise would have gone to the MTA, along with funds that were projected to

go to transit agencies that ultimately did not apply,[17] to other grantees.  As a result, every TSGP

applicant aside from the MTA received a final award larger than their respective NOFO target

allocations.[18]

        Plaintiff did not receive notice from FEMA regarding its TSGP grant award, or lack

thereof, on September 26 or any time thereafter.  On September 30, 2025, Streetsblog New York

City published a story reporting that "[t]he federal government will deny the MTA tens of millions

of dollars in requested security grant funding, withholding every dollar the agency asked for because

New York City and New York state are 'sanctuary jurisdictions.'"[19] Later that day, plaintiff received

a copy of a presentation, dated September 29, 2025, made by FEMA to congressional staff.[20]  That

presentation indicated that (1) New York's TSGP award had been reduced to $0, (2) the money that

New York otherwise would have received had been reallocated to other grantees, and (3) the MTA

---

[16]    Dkt 24 at ¶ 7.

[17]    Four transit agencies for whom the NOFO set target allocations ultimately did not apply for FY 2025 TSGP funds.  *See* Dkt 3-1 at 36–37 (including target allocations for the Los Angeles County Metropolitan Transportation Authority, Tri-County Metropolitan District of Oregon, Minneapolis Metro Transit, and King County Department of Transportation); Dkt 3-3 at 26 (noting that these four agencies did not apply for FY 2025 TSGP funds).

[18]    *See* Dkt 3-1 at 36–37; Dkt 3-3 at 26.

[19]    Dkt 3-2.

[20]    Dkt 3-3.  The government does not dispute the authenticity of this document.

"was not selected because it is based in a Sanctuary Jurisdiction city."[21]

III.    *Related Funding Cuts and Restoration*

In addition to the TSGP, FEMA administers the Homeland Security Grant Program ("HSGP").  Like the TSGP, the HSGP was established in response to the recommendations of the 9/11 Commission.[22]  The HSGP includes multiple subcomponents, namely the State Homeland Security Grant Program ("SHSP")[23] and the Urban Area Security Initiative ("UASI").[24]

In similar fashion to the events in this case, around August 1, 2025,[25] FEMA issued a NOFO for FY 2025 providing target allocations for the HSGP, including a $130 million target allocation for the State of New York.[26]  On September 27, 2025, FEMA issued final awards under the HSGP that differed significantly from the NOFO target allocations, reducing New York's

---

[21]    *Id.* at 25–26.

[22]    Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, Secs.  2003, 2004, 121 Stat. 266, 274–79 (2007), codified at 6 U.S.C. §§ 604, 605.

[23]    *See* 6 U.S.C. § 605.

[24]    *See* 6 U.S.C. § 604.

[25]    FHS first released two versions of the NOFO on July 28, 2025, and subsequently issued a third version on August 1, 2025.  *See* California Office of Emergency Services, Grant Management Memorandum GMM 2025-06 (Aug 8, 2025), https://www.caloes.ca.gov/wp-content/uploads/Grants/Documents/GMM-2025-06-FY25-HSGP-Application-Updates-and-Allocations.pdf.

[26]    DHS, Notice of Funding Opportunity Fiscal Year 2025 Homeland Security Grant Program at 54, 56, https://www.fema.gov/sites/default/files/documents/fema_gpd_homeland-security-grant-program-nofo_fy2025.pdf.

8

allocation by 79% to $27.7 million[27] and reallocating those funds to other states.  A week later, after New York and other states sued to challenge the reduced awards,[28] President Trump announced via Truth Social that he had "reversed the cuts made to Homeland Security and Counterterrorism for New York City and State."[29]  In a statement, FEMA confirmed that it was "announcing full funding of H.S.G.P. grants to effectively counter and combat security threats within the Empire State."[30] Nevertheless, no change was made to the elimination of any TSGP grant to the MTA.

IV.    *Procedural History*

         The State of New York filed this lawsuit against DHS, FEMA, DHS Secretary Kristi Noem, and FEMA Administrator David Richardson (collectively "defendants" or the "government") on September 30, 2025.[31]    It alleged claims for (1) arbitrary and capricious agency action in

---

[27]     New York Fiscal Year 2025 HSGP Award Letter, *Illinois v. Noem*, No. 25-CV-495 (D.R.I., filed Sept. 29, 2025), Dkt 3-20 at 44.

[28]     *Illinois v. Noem*, No. 25-CV-495 (D.R.I., filed Sept. 29, 2025).

[29]     Donald J. Trump @realDonaldTrump, TruthSocial (Oct. 3, 2025), https://truthsocial.com/@realDonaldTrump/posts/115311232842528048.

[30]     Grace Ashford & Tyler Pager, *Trump Administration Reverses $187 Million in N.Y. Counterterrorism Cuts*, N.Y. Times (Oct. 3, 2025), https://www.nytimes.com/2025/10/03/nyregion/trump-new-york-counterterrorism-funds.html.

[31]     Dkt 1.  The State of New York alleges, and defendants do not dispute, that New York is injured by the Reallocation Decision because the decision "will severely impact the State's security programs, including those aimed at protecting New York citizens from weapons of mass destruction and terrorist threats and attacks" and "[w]ithout TSGP funding, New York will be forced to significantly reduce its police presence (including training and equipment) and its counterterrorism security footprint."  *Id.* ¶ 49.

violation of the APA, (2) *ultra vires* agency action not authorized by Congress, (3) agency action in excess of statutory authority and contrary to law in violation of the APA, and (4) violation of the U.S. Constitution equal sovereignty principle.[32]

That night, shortly before the lapse of the TSGP FY 2025 appropriation, plaintiff moved for a temporary restraining order ("TRO") seeking, *inter alia*, to enjoin defendants from distributing TSGP funds.[33]  After the case was assigned to it on October 1, 2025, the Court issued a temporary restraining order ("TRO") enjoining defendants from "disbursing, processing, returning to the U.S. Treasury, otherwise making unavailable to plaintiff by any means . . . more than $49,801,500 of the $83,700,000" appropriated for the TSGP in FY 2025.[34]  At the hearing, the Court noted it was "entertaining the possibility of consolidating a trial on the merits under Rule 65(a)(2) with a hearing on the preliminary injunction" given the paucity of relevant factual issues, and the parties provisionally consented to that approach.

After additional briefing from the parties, the Court held oral argument on whether a preliminary injunction should issue.  At that hearing, the Court again asked the parties about consolidation of trial on the merits with the preliminary injunction, and both parties consented to doing so.  The Court further asked the parties if they were "prepared to have the Court try the case on the existing record, and to whatever extent there may be inferences that need to be drawn one way or another, or credibility issues or anything like that, to make those findings on the present

---

[32]     *Id.* ¶¶ 50–77.

[33]     Dkt 2.

[34]     Dkt 12.

record."  Both sides consented.[35]

***Discussion***

I.      *Mootness*

As initial matter, the Court must determine whether it has subject matter jurisdiction over this action.  "Article III of the Constitution limits federal courts' authority . . . to disputes involving 'live cases and controversies.'  A number of justiciability doctrines govern the contours of this power; pertinent here is mootness, which concerns when and whether a case is 'live.'  Specifically, under the 'general rule' of mootness, courts' subject matter jurisdiction ceases when 'an event occurs during the course of the proceedings or on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party.'"[36]

Here, the government argues that it is impossible for the Court to grant any effectual relief to plaintiff because the government is immune from suit and no exceptions to that immunity apply.  Plaintiff counters that it may obtain relief pursuant to Section 702 of the APA.

A.      *APA Legal Framework*

"Absent an 'unequivocally expressed' statutory waiver, the United States, its agencies, and its employees (when functioning in their official capacities) are immune from suit

---

[35]

Hearing Tr. at 16:25–18:1; Dkt 33.

[36]

*County of Suffolk, N.Y. v. Sebelius*, 605 F.3d 135, 140 (2d Cir. 2010) (quoting *United States v. Quattrone*, 402 F.3d 304, 308 (2d Cir. 2005)).

based on the principle of sovereign immunity."[37]  In *County of Suffolk v. Sebelius,*[38] however, "plaintiff[] escaped this bar by invoking § 702 of the APA."[39]  That section authorizes "relief that requires a defendant to transfer a specific *res* to the plaintiff" but does not authorize "relief that seeks to compensate a plaintiff for a harm by providing a substitute for the loss. . . . [I]n cases challenging an agency's expenditure of funds, the *res* at issue is identified by reference to the congressional appropriation that authorized the agency's challenged expenditure.  To seek funds from another source is to seek compensation rather than the specific property the plaintiff aims to recover. A claim seeking the former type of relief falls outside the scope of the waiver of sovereign immunity arising from § 702 of the APA."[40]

In *County of Suffolk,* the Second Circuit applied this framework in the context of a lawsuit seeking funds to which the plaintiff claimed a statutory entitlement.  There, the funds at issue — from a grant program administered by the Department of Health and Human Services — already had been obligated and disbursed to other grantees.  The Second Circuit held that the case was moot because "[w]here . . . the congressional appropriations relating to the funds sought by private litigants have been lawfully distributed — and therefore exhausted — by a federal agency, courts lack authority to grant effectual relief in the context of an Article III case or controversy."[41]

---

[37]  *Id.* (quoting *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260–61 (1999)).

[38]  *Id.*

[39]  *Id.*.

[40]  *Id.*

[41]  *Id.* at 138.

### B.    Significance of Obligation of TSGP Funds

Here, the government represents, and plaintiff does not dispute, that when "grant recipients were provided with a final Award Letter . . . all the TSGP awards were obligated, and no funds remained available to FEMA to make additional TSGP awards."[42]    The Court assumes, without deciding, that the funds were obligated to grantees on this date, whatever "obligated" or "obligation" means in this context.[43]    The government represents, however, and the Court finds, that "no FY 2025 funds have been disbursed."[44]    The dispositive question with respect to mootness, therefore, is whether the mere obligation — as opposed to disbursement — of appropriated funds forecloses a claim to those funds.

Judge Furman addressed this precise question in *Rodriguez v. Carson*.[45]    There, the plaintiffs brought an APA claim seeking reimbursement from the U.S. Department of Housing and Urban Development out of appropriations from fiscal years 2011 through 2019.    Citing *County of Suffolk*, the court ruled that the court lacked authority to order reimbursement from the appropriations for fiscal years 2011 through 2018 because those appropriations had been disbursed and exhausted.[46]    The same was not true for fiscal year 2019, however, because the funds

---

[42]    Dkt 24 at ¶ 7.

[43]    The relevant statute does not define either term.  *See* 31 U.S.C. § 1502(a).

[44]    Dkt 24 at ¶ 11.

[45]    401 F. Supp. 3d 465 (S.D.N.Y. 2019).

[46]    *Rodriguez v. Carson*, No. 17-CV-4344 (JMF), 2019 WL 3296961, at *2 (S.D.N.Y. July 22, 2019).

appropriated for that term, although contractually obligated, had not been disbursed.

      *Rodriguez* recognized that *County of Suffolk* "turned on a straightforward application of the Appropriations Clause. That is, where funds have been expended, 'federal courts are without authority to provide monetary relief because the Appropriations Clause prevents additional funds from being paid out of the Treasury.'"[47] "That limitation does not apply where, as here, Congress has appropriated funds and those funds are still around; to comply with a court order requiring those funds to be used for reimbursement, no other money would need to be '*drawn* from the Treasury.' In other words, there *is* a crucial difference between obligated and disbursed funds as far as the Appropriations Clause is concerned."[48] Accordingly, the court ruled that the funds in question for fiscal year 2019 were available as a subject of specific relief and thus ordered HUD to reimburse plaintiffs from the fiscal year 2019 appropriation.[49]

      The Court agrees with *Rodriguez* that the distinction between obligated and disbursed funds is salient. The logic behind *County of Suffolk* is the "straightforward and explicit command of the Appropriations Clause" that "'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'"[50] Here, the ultimate relief sought by plaintiff — the award of TSGP funds — would not require any additional money to be paid out of the Treasury. Rather,

---

[47]    *Rodriguez*, 401 F. Supp. 3d at 470 (quoting *County of Suffolk*, 605 F.3d at 142).

[48]    *Id.* (quoting U.S. Const. art. I, § 9, cl. 7).

[49]    401 F. Supp. 3d at 470.

[50]    *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

it would require defendants to reallocate and pay to the MTA appropriated funds that FEMA would have paid to it had FEMA not withheld them in violation of the APA.

   The government argues that the Court "should follow *County of Suffolk* and hold that plaintiff's claims are moot."[51]  Although *County of Suffolk* did not address the circumstances present here, the government makes much of the Second Circuit's statement that it would "follow" *City of Houston v. Departmentt of Housing & Urban Development*,[52] in which the D.C. Circuit suggested that the award of funds to other recipients may render them unavailable.[53]  Judge Furman, however, successfully and convincingly refuted this precise argument in *Rodriguez*, explaining:

> "Defendants are wrong, meanwhile, to place the weight they do on the Second Circuit's statement that it would 'follow' *City of Houston*.  The Second Circuit stated its holding clearly: that because the 'res at issue' in a reimbursement suit is the appropriation that authorized the challenged expenditure, where those appropriations have 'been lawfully distributed — and therefore exhausted — by a federal agency, courts lack authority to grant effectual relief in the context of an Article III case or controversy.'  Indeed, the Second Circuit made clear that its 'analysis turn[ed] on the fact that . . . [the agency] had exhausted' the appropriations at issue, and even took care to note that its holding was "no broader than the facts of the case before [it].'  Given that, the Court does not read the Second Circuit's statement that it would 'follow' *City of Houston* to incorporate any more of *City of Houston* than was necessary to support the holding in *County of Suffolk*. And because, in *County of Suffolk*, the Second Circuit confronted a record indicating the relevant funds had been 'expend[ed],' the Court does not read *County of Suffolk* to decide this case,

---

[51]   Dkt 25 at 7.

[52]   24 F.3d 1421 (D.C. Cir. 1994).

[53]   *Id.* at 1426 ("Funds appropriated for an agency's use can become unavailable . . . if the funds have already been awarded to other recipients.").  As set forth below, the D.C. Circuit held in another case, *Population Institute v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986), that a claim for injunctive relief remains viable where funds have been obligated but not disbursed.

where the funds have not been expended."[54]

The government next argues that *Rodriguez* is distinguishable from this case because the appropriation here (1) has been exhausted and (2) has lapsed. It is mistaken. First, as in *Rodriguez*, the appropriated funds here have not been exhausted because they have not been distributed.[55] Second, the lapse of the appropriation is a distinct argument. Under this theory, the funds first became unavailable on October 1, 2025, after this suit was filed — not on September 26, 2025, when award notifications were issued. The Court addresses the lapse argument separately below.[56]

The government's reliance on *dicta* in *County of Suffolk* and *City of Houston* is misplaced in light of the D.C. Circuit's contrary ruling in *Population Institute v. McPherson*.[57] There, the plaintiff sought an injunction requiring the government to release funds that Congress had earmarked for a United Nations agency but that the government had withheld and obligated to other organizations. The D.C. Circuit held that the plaintiff had a viable claim for injunctive relief because "[a]lthough the government ha[d] *obligated* these funds to other organizations, as yet no money ha[d] been *disbursed*."[58] So too here. Plaintiff's claim for injunctive relief is viable because

---

[54]      401 F. Supp. 3d at 470 (alterations in original) (quoting *County of Suffolk*, 605 F.3d at 138–42).

[55]      *County of Suffolk*, 605 F.3d at 138 (action moot where funds "have been have lawfully *distributed* — and therefore exhausted — by a federal agency" (emphasis added)).

[56]      *See* Part I.D, *infra*.

[57]      797 F.2d 1062 (D.C. Cir. 1986).

[58]      *Id.* at 1081.

the appropriated TSGP funds, even if now "obligated," have not been disbursed.

      The Government Accountability Office's ("GAO") *Principles of Federal Appropriations Law* — which the U.S. Supreme Court, the Court of Appeals for the Federal Circuit, and other circuits have relied on to resolve issues of appropriations law[59] — reinforces the rulings in *Rodriguez* and *Population Institute*. The GAO provides that the government may deobligate funds "for a variety of reasons," including where the "[i]nitial obligation [is] determined to be invalid."[60] An obligation is invalid where the government purports to obligate funds that it does not have the authority to obligate, including where it purports to obligate funds after the lapse of an appropriation.[61] Here, plaintiff's claim is that the government's obligation of funds that otherwise would have been obligated to the MTA was arbitrary and capricious. If plaintiff prevails on the merits of that claim, then the government's obligation of those funds, if obligation occurred, was invalid. The government's purported obligation of all TSGP funds to other grantees therefore does not moot this action.

      Finally, the Court notes the inconsistency between the government's position in this

---

[59]
    *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1084 (Fed. Cir. 2003) ("Several fundamental principles of appropriations law, as enunciated by the Supreme Court, by this court, by our predecessor court, and by other circuits are relevant to this case. These decisions have relied on the opinions of the [GAO], as expressed in *Principles of Federal Appropriations Law*, and on the opinions of the Comptroller General, both of whose opinions, while not binding, are 'expert opinion[s], which we should prudently consider.'" (third alteration in original) (quoting *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C.Cir.1984))), *aff'd and remanded sub nom. Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005).

[60]
    2 U.S. General Accounting Office, Principles of Federal Appropriations Law at 7-60 (3d ed.).

[61]
    *Id.* at 7-12.

litigation and its actions with respect to the HSGP.  As set forth above, the government "restored" $187 million in HSGP funding to the State of New York that previously, on the government's theory, had been "obligated" to other grantees.  Those funds were "obligated," if at all, pursuant to the same statutory and regulatory provisions as the TSGP funds.  Evidently, the government's action in "obligating" the HSGP funds did not render them unavailable or immune from reallocation.  In other words, the government's view appears to be that the president unilaterally can deobligate grants to and reobligate grants among grantees, but a court may not order the government to do so in order to enforce federal statutes.  There is no statutory or other authority for such a position.  The funds either are available or they are not.  Elsewhere, the government has taken the position that funds remain available after they purportedly have been obligated.  The Court agrees.

### C.    *Significance of Appropriation Lapse*

The government argues also that the lapse of the FY 2025 appropriation on September 30, 2025, rendered the funds unavailable.  In *City of Houston*, the D.C. Circuit ruled that a court may "award funds based on an appropriation even after the date when the appropriation lapses, so long as 'the lawsuit was instituted on or before that date.'"[62]  The lawsuit here was initiated on September 30, 2025, prior to the lapse of the appropriation at issue at midnight on that day.  Under *City of Houston*, lapse of the appropriation therefore did not render the appropriated funds unavailable.

Although the Second Circuit did not rule on the availability of this exception in

---

[62]  *City of Houston*, 24 F.3d at 1426 (quoting *West Va. Ass'n of Community Health Ctrs. v. Heckler*, 734 F.2d 1570, 1576 (D.C.Cir.1984)).

*County of Suffolk*,[63] the government has cited no authority in this Circuit or elsewhere foreclosing it. Indeed, in *Population Institute*, the D.C. Circuit noted that "it is well settled that federal courts may award appropriated funds to a successful litigant even after the statutory lapse date if, as here, the suit was initiated on or before that date."[64] This Court agrees where, as here, plaintiff (1) justifiably expected that it would receive substantial funds based on the NOFO and decades of prior grant awards, (2) did not receive any notice that its grant would be reduced, much less eliminated, and (3) learned about the funding cut on September 30, 2025, the day the appropriation lapsed, and therefore practicably could not obtain injunctive relief before the lapse of the appropriation.

Furthermore, the government's position with respect to lapse is at odds with its restoration of HSGP funds to New York. The appropriation of those funds lapsed on October 1, 2025,[65] but the funds were "restored" to New York on October 3. The government's conduct supports the conclusion that lapse of an appropriation does not prevent the government from obligating funds to a grantee after the lapse, at least where the grantee filed a lawsuit seeking those funds on or before the date of lapse.[66]

---

[63]

605 F.3d at 141 n.8.

[64]

797 F.2d at 1081.

[65]

*See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 607, (1)–(2) (appropriating HSGP funds for FY 2024); Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, § 1101(a)(6), 139 Stat. 9, 11 (reauthorizing appropriating for FY 2025.

[66]

Prior to the lapse of the FY 2025 HSGP appropriation, New York and other states filed suit seeking an order directing the government to award it funds to which it claimed entitlement. *Illinois v. Noem*, No. 25-CV-495 (D. R.I., filed Sept. 29, 2025).

II.      *Legal Standard*

Having established its subject matter jurisdiction, the Court now turns to the merits of plaintiff's claims.  As set forth above, the Court notified the parties of its intent to consolidate disposition of the preliminary injunction motion with its merits determination given the lack of significant factual issues in dispute, and the parties consented to this approach.  The preliminary injunction motion is based on plaintiff's APA arbitrary and capricious claim only, and the parties have not briefed any of plaintiff's remaining claims.  Accordingly, the Court assesses the propriety of permanent injunctive relief based solely on plaintiff's APA arbitrary and capricious claim.[67]

A party seeking a permanent injunction must demonstrate actual success on the merits, irreparable harm, that the balance of equities tips in its favor, and that an injunction is in the public interest.[68]  "Where, as here, the government is a party to the suit, the final two factors merge."[69]

III.     *Success on the Merits*

An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the

---

[67]  Plaintiff's remaining claims seek the same relief as the APA arbitrary and capricious claim. Given the Court's disposition of the APA arbitrary and capricious claim *infra*, the Court need not reach the merits of the remaining claims.

[68]  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

[69]  *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

problem, offered an explanation for its decision that runs counter to the evidence before the agency, or that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[70]  The Court's "scope of review is 'narrow': [it] determine[s] only whether the Secretary examined 'the relevant data' and articulated 'a satisfactory explanation' for [her] decision, 'including a rational connection between the facts found and the choice made.'"[71]

        Plaintiff argues that the Reallocation Decision was arbitrary and capricious because DHS and FEMA "(1) provided no explanation at all, (2) relied on extra-statutory considerations; (3) relied on factors not set forth in the notice of funding opportunity, without explaining its change in position; and (4) ignored the States' profound reliance interests in critical anti-terrorism federal funding . . . ."[72]

        The government counters that it provided an explanation for its decision in the NOFO, which states that "[a]n immigration term and condition, including those in the DHS Standard Terms and Conditions, may be material to the Department of Homeland Security's decision to make this grant award."[73]  This justification is arbitrary and capricious for at least three independent reasons.

        First, the statute governing the award of TSGP funds requires that the DHS Secretary

---

[70] *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[71] *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S.*, 463 U.S. at 43).

[72] Dkt 2 at 7–8.

[73] Dkt 3-1 at 34.

"select the recipients of grants based solely on risk."[74]  Congress's use of the word "solely" makes clear beyond any doubt that the Secretary may not consider factors unrelated to risk.  The government concedes, and the Court finds, that the Reallocation Decision was not based on risk. Instead, the government argues that "[e]nsuring that recipients enforce federal immigration laws and policies is a rational reason in support of the agency's denial of federal funds."[75]  Regardless of whether this constituted a "rational reason" for the Reallocation Decision, the decision nonetheless was arbitrary and capricious because FEMA's reliance on a non-risk factor constituted reliance on a factor proscribed by statute.[76]

The government argues also that "[w]hile Congress cannot regulate the States, its constitutional powers . . . do allow it to fix the terms on which it shall disburse federal money to the States."[77]  The government is correct that *Congress* may fix terms on the disbursement of federal money to the States.  But here, Congress did not authorize the DHS Secretary to fix immigration-related terms or conditions on the disbursement of TSGP funds.  To the contrary, Congress prohibited DHS from imposing such terms by requiring the selection of grant recipients to be "based solely risk."[78]  Accordingly, the asserted basis for the Reallocation Decision — the implication

---

[74]

6 U.S.C. § 1135(c)(2).

[75]

Dkt 25 at 11.

[76]

*See Motor Vehicle Mfrs. Ass'n of the U.S.*, 463 U.S. at 43 (agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider").

[77]

*Id.* (quotation marks omitted) (quoting *State v. Dep't of Just.*, 951 F.3d 84, 114 (2d Cir. 2020)

[78]

6 U.S.C. § 1135(c)(2).

that the MTA, the State, or the City was not in compliance with immigration-related grant conditions — was arbitrary and capricious because Congress precluded DHS from imposing, and in any case did not authorize it to impose, such conditions on TSGP funds.

Second, "[a]n agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'"[79] The APA requires "contemporaneous explanations" for agency actions.[80] That requirement "appl[ies] with equal force regardless whether post hoc justifications are raised in court by those appearing on behalf of the agency or by agency officials themselves."[81]

The government argues that it provided a contemporaneous explanation for the Reallocation Decision in the NOFO, which stated that "[a]n immigration term and condition, including those in the DHS Standard Terms and Conditions, may be material to the Department of Homeland Security's decision to make this grant award"[82] This blanket statement did not "reasonably explain[]" the Reallocation Decision.[83] It did not specify any particular term that might be material nor any particular term the MTA allegedly did not comply with. It did not state that the MTA might be held responsible for New York City's status as a sanctuary jurisdiction — the basis

---

[79]   *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 280 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

[80]   *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020).

[81]   *Id.*

[82]   Dkt 3-1 at 34.

[83]   *Ohio*, 603 U.S. at 280.

for the decision asserted by a FEMA official in this litigation.[84]  And it did not explain what, if anything, changed with respect to compliance with immigration terms and conditions between the publication of the $33,898,500 target allocation and the Reallocation Decision. Accordingly, the Reallocation Decision was arbitrary and capricious because the government did not provide a reasonable, contemporaneous explanation for the decision.

Third, even if the enforcement of immigration-related conditions were statutorily authorized and had been given as a contemporaneous explanation for the Reallocation Decision, the government's application of that justification exclusively to the MTA was wholly arbitrary. According to a declaration submitted by FEMA Acting Deputy Administrator for Resilience David Arnold, the MTA "did not receive funding because the applicant is based in New York City, a designated Sanctuary Jurisdiction city, that was not a plaintiff subject to court orders in either of *San Francisco v. Trump*, No. 3:25-cv-1350 (N.D. Cal.) or *Illinois v. FEMA*, No. 25-cv-206 (D.R.I.)."[85]

Mr. Arnold's explanation makes very little sense.  As an initial matter, the MTA is "a body corporate and politic constituting a public benefit corporation" created by New York State law.[86]  The MTA's board is appointed by the governor of New York with the advice and consent of the New York State Senate.[87]  The MTA is not an instrumentality of New York City.

---

[84]

    *See* Dkt 24 at ¶ 5.

[85]

    Dkt 24 at ¶ 5 (citing U.S. Dep't of Just., Justice Department Publishes List of Sanctuary Jurisdictions, U.S. Dep't of Just. (last updated Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuaiy-jurisdictions.

[86]

    N.Y. Pub. Auth. L. § 1263, subd. 1(a)(1).

[87]

    *Id.*

Moreover, several other TSGP FY 2025 grantees are "based in" sanctuary cities.[88] Although some of those cities are plaintiffs in *San Francisco v. Trump*, others — including the Southeastern Pennsylvania Transportation Authority (based in Philadelphia) and New Jersey Transit Corporation (based in Newark) — are not. Indeed, another TSGP grantee, the Port Authority of New York & New Jersey, is headquartered in New York City but nevertheless was granted FY 2025 TSGP funds. Even accepting Mr. Arnold's purported rationale at face value, it would not reasonably explain the Reallocation Decision because that decision *increased* grants to some sanctuary cities or entities based in or serving them while *eliminating* any such grant to the MTA.[89] Accordingly, the Reallocation Decision was arbitrary and capricious because it "runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[90]

## IV.  *Irreparable Harm*

"Irreparable harm is injury that is neither remote nor speculative, but actual and

---

[88]  Mr. Arnold's declaration cites the Department of Justice's list of sanctuary cities. *See* U.S. Dep't of Just., Justice Department Publishes List of Sanctuary Jurisdictions, U.S. Dep't of Just. (last updated Aug. 5, 2025), https://www.justice.gov/opa/pr/justice-department-publishes-list-sanctuaiy-jurisdictions. That list includes Boston, Chicago, Denver, Los Angeles, Newark, Philadelphia, Portland, and San Francisco, all of which are home to transit agencies that received FY 2025 TSGP grants. *See* Dkt 3-3 at 26.

[89]  *See* Dkt 3-3 at 26 (reflecting increased grants for grantees relative to NOFO target allocations).

[90]  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

imminent and that cannot be remedied by an award of monetary damages."[91]  Here, plaintiff's injury — the arbitrary and capricious withdrawal of TSGP funds — is neither remote nor speculative. Absent injunctive relief, the MTA will lose those funds.  And "because money damages are prohibited in APA actions," economic injuries caused by arbitrary and capricious agency action "are irreparable."[92]  Accordingly, the irreparable harm element is satisfied here.

### V.    Balance of the Equities and Public Interest

"There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"[93]  As set forth above, the Reallocation Decision is unlawful, and there is no public interest in its perpetuation.  On the other hand, the Reallocation Decision would undermine the public interest by misallocating security-related funding not on the basis of risk, endangering those whom that funding was intended to protect.

The government argues that "[a]ny time [the Government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."[94]  But here, an injunction would not prevent the government from "effectuating statutes

---

[91]    *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (citation omitted).

[92]    *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020).

[93]    *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

[94]    Dkt 25 at 12 (second alteration in original) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025)).

enacted by representatives of its people." The Reallocation Decision violates statutes enacted by Congress, including the APA and the TSGP-enabling statute. An injunction would effectuate those statutes.

Accordingly, the balance of the equities and the public interest weigh in favor of an injunction.

## VI.    Remedy

Having established the propriety of a permanent injunction, the Court turns to the question of remedy. "In the usual case, when an agency violates its obligations under the APA, [courts] will vacate a judgment and remand to the agency to conduct further proceedings. This rule, however, is not absolute."[95] "[R]emand to the agency for further proceedings is not necessary" where "there is compelling evidence in the record — a record that would not change if remanded to the agency — that [the plaintiff] is entitled to [funds sought from the agency]."[96]

Here, there is no ambiguity regarding the basis for the Reallocation Decision — New York City's status as a sanctuary jurisdiction — even if it was not disclosed adequately at the time of the decision. The government states, and this Court finds, that this was the only reason for the Reallocation Decision.[97] In the absence of that improper consideration, the evidence unambiguously shows, and the Court finds, that the MTA would have received the target allocation reflected in the

---

[95] *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) (citation omitted).

[96] *Id.*

[97] *See* Dkt 24 at ¶ 5.

NOFO, $33,898,500. Accordingly, the Court (1) will not remand to the agency to conduct further proceedings, and (2) will enjoin defendants to obligate and, as specified in the Judgment, disburse $33,898,500 in FY 2025 TSGP funds to the MTA.

Plaintiff suggests that the Court should order the government also to de-obligate or reduce grants of TSGP FY 2025 funds to the extent those grants exceeded the target allocations reflected in the NOFO.[98] The Court recognizes that, consistent with the Appropriations Clause, the government must de-obligate FY 2025 TSGP grants to the extent, if any, they validly have been obligated to other grantees to comply with this Court's order. The Court does not have enough information, however, to determine conclusively that the defendants would have issued final awards to all grantees equal to the NOFO's target allocations. That all FY 2025 TSGP grantees aside from plaintiff are not parties to this action further counsels restraint in that regard. Defendants may indeed determine that rescinding grants to the extent they exceed the NOFO target allocations is the best means of compliance with the Court's order. But that exercise of discretion need not be made by the Court in order to grant effective relief. Accordingly, the Court will not dictate the precise amounts defendants must rescind or deobligate from other grantees in order to obligate $33,898,500 to the MTA.

### *Conclusion*

The foregoing constitute the Court's findings of fact and conclusions of law. Plaintiff having applied for a preliminary and permanent injunction, the parties having consented to the Court

---

[98] *See* Dkt 2 at 14.

ruling finally on plaintiff's first cause of action ("Violation of the Administrative Procedure Act Arbitrary and Capricious Agency Action"), and the Court having found that plaintiff has established (1) actual success on the merits of its claim, (2) irreparable harm, and (3) the balance of the equities and the public interest weigh in plaintiff's favor, it is hereby **ORDERED** as follows:

1. Plaintiff shall have judgment against defendants as reflected in the FINAL JUDGMENT OF PERMANENT INJUNCTION dated October 15, 2025.

2. The temporary restraining order entered herein on October 1, 2025, and extended earlier on October 15, 2025, is terminated upon entry of the FINAL JUDGMENT OF PERMANENT INJUNCTION.

3. The Clerk shall close the case.

SO ORDERED.

Dated:    October 15, 2025

_____
Lewis A. Kaplan
United States District Judge